Good afternoon, Your Honor. My name is Bob Diggs, and may it please the Court, I'm Bob Diggs, and I represent American Trucking Association, and for calming purposes, and to cross that T and dot that I, I would like to reserve two minutes for rebuttal, if time permits. This is the second time this case has been before this Court on the issue of whether or not certain concession requirements required by the Port of Los Angeles, I may mention, as the Court is probably aware, that this case initially involved the Port of Long Beach as well, concession agreements at that port. However, they've withdrawn those concession agreements, and the case has been settled. So, ATA and Long Beach have settled the case. We only have at issue the agreement as applied by the Port of Los Angeles. I was under the impression, by the way, that the Port of Long Beach and the Port of Los Angeles were just sort of consistent with each other, and almost part and parcel of each other. Of course, you understand, I'm from North Dakota, so I'm familiar with this, but I've been to California many times. Is that true, or are they really separate ports, and operate separately, and we should look at it that way? Well, the ports, I think, are contiguous. I'm not sure how much burden there is to go from one port to the other, but they are in one central location. As far as these agreements went, the concession agreements were very similar between the two ports. However, the Port of Los Angeles had one component, the mandate that trucking companies only use employee drivers, rather than being able to use independent contractors that Long Beach did not have. Well, that's out now, anyway. That has been enjoined, at least preliminarily, by the court in the first appeal. So, how much consideration, I suppose none, in the fact that there's been a settlement in one part of the case? That's none of our business? I imagine that would be the right legal answer, Your Honor. Judge Gould with a question. Don't these ports have separate commissioners, or separate boards they report to? Yes, Your Honor. So, they're parts of separate municipal entities, right? Yes, each harbor commission, each is governed by a board of harbor commissioners, and they are separate commissions. Separate cities. Yes, Your Honor. Separate cities. Okay. So, the settlement was with the Port of Long Beach, and that concerned this independent contractor issue. No, Your Honor, that was not in the settlement. That was not in it, but it was in the LA one. That's correct, Your Honor. Was that the big stumbling block? You'd have to ask LA's counsel, but at this point, I think that certainly is a reason why Los Angeles and ATA have not settled the case. In any event, as I mentioned... Is that a safety issue? No, Your Honor, we do not believe it's a safety issue. Certainly, the Court in its initial opinion in this case did not believe it had any relation to safety. In the initial opinion, this Court determined that it was likely that many components... Do they receive compensation equivalent to the prevailing wage? Your Honor, I believe there's been a study done at the Port of Los Angeles that they did not, although they are not compensated in a way. They own their own equipment, so they lease their trucks. So their compensation is not only for their own work efforts, but for the equipment they bring to the business relationships. They are paid based on as an independent businessman who brings... The drivers of these dreyage trucks, they own their trucks? They do. The independent contractors, yes, they own the cabs. In all instances? That's usually a requirement of being considered an independent contractor is that you have a substantial investment. Well, that's not usually the way it's... There's a lot of different ways they can work them. You know, we can rent you this truck for the day or the week, and now you're an independent contractor. I mean, it's all... You know, that's a maneuver to avoid paying prevailing wage. In many instances. Well, they certainly are. There are various agencies that look into that, and all I can tell you is that generally one of the criteria is that... What agencies look into that? The Internal Revenue Service, various state workers' compensation commissions, unemployment commissions for purposes of employment-related laws as to whether the relationship is legitimate. But, you know, the inspectors on those laws are, you know... One time I checked this a while back, and I think on whether the prevailing wage was paid or not, maybe there were two inspectors for the whole state of California. There's no way in the world you could enforce that provision. Well, Your Honor, regardless of whether they're being paid prevailing wage, the Port of Los Angeles has no ability to re-regulate the trucking industry in order to effectuate a purpose related to employment law or anything else. The only thing, as this Court found earlier, that would allow the Port to re-regulate the trucking industry was if any of the regulations related to motor vehicle safety... Let me go over some of these things with you. I know you don't have a lot of time. Here are the provisions that I listed as not preempted. And I wanted to ask you a little bit about just a question or so about one. Require concessionaires to be licensed motor carriers. Now, I know that's duplication, but duplication or not, doesn't that relate in some way to safety to have a licensed driver? Well, Your Honor, here's our position on that. There's no question that that type of provision and many of the other provisions, maintenance of equipment or driver qualifications, those all relate to safety. There's no question about that. But the question is, as this Court said in the original opinion, the test is whether it genuinely reflects a safety concern, whether this is aimed at a genuine safety concern. And these are duplications. These are duplications, but what bothers me, are you saying because they're duplications, you cannot consider that there is a safety concern? Well, let me back up and say this Court cited the Loyal Tire case, and the Loyal Tire case was decided in by Judge Sotomayor. And what she said is, of course, you can have a relationship to safety, but not be enacted in order to deal with a genuine safety concern. So my point, Your Honor, is that these provisions, these driver qualifications, these maintenance, this is already required by federal law. The ports already have the full independent authority to enforce all of those federal requirements. They're not adding anything new to any of those provisions. They're not adding any new requirements. They are simply saying that using the concession agreement to somehow make the individuals more accountable. And our point is that if these provisions have already been addressed by federal law that the courts can enforce, then they are not related to a legitimate new safety concern. They're not related to any concern because that concern has already been addressed. I understand your position. Now, let me go to the next one. Requiring concessionaires to use only permitted trucks. I take it permitted trucks would require that the trucks be properly maintained and so on and so forth. Doesn't that have some relevance to safety? It's the same answer, Your Honor. It's the same answer. Okay. How about driver compliance? There's a safety concern, but you're saying it's duplication. It's duplication. The ports already, Your Honor, the port can stop a truck from coming into the port if it has a safety problem. They can do inspections of trucks if they have safety problems. They can put trucks out of service if they have safety problems. But you're saying they can do that under the federal law. They can do it under the federal law, which they have the power to enforce. They're different compliance requirements. Never mind. All right, truck maintenance, that's about the same thing, isn't it? I'm sorry? Truck maintenance. Yes, sir. And now the other one was what we call a TWC, credential requirements, a concern about terrorism.  We do, Your Honor. Why? Tell me why. Safety is associated with developing to deal with potential accidents or incidents that are caused by unintentional behavior. Poor safety practices, you know, failing to follow regulations, failing to maintain a truck. Those can cause accidents that are unintended. Security relates primarily or almost wholly to intentional acts and mostly criminal acts in which a person intentionally is violating the law. They are either, it could be terrorism, it could be cargo theft. But it's aimed at intentionally, at acts that are intentionally done, not in unintentional acts. And it's clear that Congress views these as being separate spheres of criteria. Congress regulates them differently. Security is controlled at the ports by the Customs and Border Patrol, by the U.S. Coast Guard. All of the safety regulations on motor vehicles are controlled by the Federal Motor Carrier Safety Administration and the California Highway Patrol. They are separate. Well, I'll tell you the stuff that occurred to me. You know, you read the paper every day, and there's some truck involved in blowing up a building in Afghanistan, in Iraq, in Israel, and trucks can be very dangerous, intentionally so. And that concerned me, but that's maybe not in this. Let's see, the other one, I do recall that on the placard requirement, your opponents concede that that's not a safety item, and they have some other reason. They concede it's not safety. They suggest that it somehow escapes the preemption under the other federal statute. I think it's 14506 because the placard requirement is only when the truck is on port property. And they're saying if we don't require them to have the placard on the truck all the time, then it's not really an identification device. Your Honor, that's the exact type of cumulative burden that that other provision was designed to prevent. You can imagine how many placards a trucker would have to keep in the back of their truck. I'm concerned with that. And I think you've got a good point on this one, and I don't question that right now. The other last question I wanted to really have you consider is the fact that this is still a preliminary injunction. All of the evidence is not in. You concede it's some safety factors, but you're arguing duplication, and they don't need it, so it's not safety-driven, so to speak. And I'm wondering about, you know, I don't understand when or if there's a need for further hearings before there is a final injunction or not by the district court. What's the plans for the final hearing? The final hearing right now is set for March 16th. We've run into some problems with discovery, so the hearing, I believe, ATA has already filed a motion to put the hearing back in order to try to get some questions related to privilege documents decided before we have to complete our deposition process. But right now the court is scheduled for a merits hearing on March 16th. Your Honor, if I could address the issue as to why we need a ruling now. I think there's one fundamental error of law that I think pervades the court's opinion below, and that is that all of these supposedly safety-related requirements, they may be duplicative, the court says, but there is one thing new, and we acknowledge there is one thing new about these safety requirements, and that is what the court says is a unique enforcement mechanism. And that unique enforcement mechanism is if the courts decide they don't like how you're maintaining your trucks or how you are responding to certain safety requirements, they give themselves the authority to revoke your operating authority in a part of interstate commerce or at the ports. So this revocation is sort of the ultimate penalty, the death penalty of a motor carrier, and the court agrees and they argue that if we hold this above the motor carrier's heads, this will make them accountable to us and will make them comply to a greater degree than they otherwise would with the safety considerations. The problem with that theory is a legal one, is that the ports don't now have nor never have had the ability to revoke or suspend the interstate operating authority of a motor carrier. It's very clear that they don't. The Department of Justice participated in this case earlier. The Department of Justice agreed with ATA on that position that the ports lacked that authority, and we cited to the court below the Castle case and the railroad transfer line of cases, and unfortunately that court just summarily rejected those cases. And the court said, well, they're 40 years old and they're no longer relevant for whatever reason. And this court didn't deal with them in the first opinion, but the district courts did. Isn't one of the concerns here air quality? There certainly is a concern, Your Honor. ATA supports the air quality standards. Again, just like the requirements related to safety, all of the air quality requirements. What's ATA doing about air quality at the ports? ATA supports the ports' programs. The port has just announced that they're three years ahead of schedule, Port of Los Angeles and air quality. The truckers and ATA are replacing their trucks. We are entering our trucks into the drage truck registry. All these things are being done without a concession plan that holds over the heads of the carriers, the idea that we can revoke your interstate authority. All of that is being accomplished. The ports can't tell you that it isn't being accomplished because it is. In fact, the port below, one of the areas that the port below did enjoin was the tariff or excuse me, was the concession requirement that the truckers retire older model trucks that we no longer use a truck. For instance, the first cut was 1989. After this year, we won't be able to use trucks that predate 2004. That was enjoined. However, we acknowledge and the court found there's a tariff that says we have to do that. We're not challenging the tariff, and that remains in place. So they're accomplishing all of their air quality goals. And as I said, according to their most recent public announcement, they're three years ahead of schedule. So they don't need the concession. They haven't done anything, and the success is all due to these tariffs. The success is due to the tariff program which controls the age of the trucks servicing the ports, which is not at issue in this litigation. All we're saying is you do not need a concession program that gives to the ports the ability to kick a motor carrier out of interstate commerce. You don't need that in order to meet the environmental goals. You don't need it for security goals. You talked about the TWIC. That's a federal requirement. They are obligated through their marine terminal operators to enforce the TWIC requirements. When a driver shows up at the gate, he has to have a TWIC. There's nothing they can do beyond that. There's nothing the trucking companies can do. The TWIC is in place. We're not challenging the TWIC. We're happy to fill in the requirements in the drage truck registry. We're happy to ensure to the best of our ability our drivers have TWICs. But there's nothing that requires us to sign a concession agreement. That doesn't help anything. That doesn't create any greater responsibility to meet federal law or help secure it in any way. If I get your position, really basically you're saying, look, we comply with the federal law. The federal law controls the trucking industry, and now why in the world do we have to subject ourselves to regulations put out by the ports here? It could be this port. It could be Los Angeles. It could be Seattle. It could be New York and so forth. So that's your complaint really is that this is interstate commerce, and look, leave us alone. Your Honor, that's it, and that's the basis of this law. Remember, this law was a deregulation law. It deregulated. It took away from states and localities the ability to regulate motor carriers, but it did preserve some safety regulation, and we're not arguing about that safety regulation that was preserved. As I said, they can still on a truck-by-truck basis do all the safety inspections they want. On a truck-by-truck basis, they can put us out of service. They can check driver qualifications. They can put drivers out of service. They can levy fines. They can do whatever they want. They do that as a state agency. It doesn't have to be a federal agency. States have the authority, and so does the port if they go through the proper process to enforce the federal regulations. California Highway Patrol. It has to be through federal authority. Right, through the federal regulatory scheme. It has to be through somebody else to enforce those regulations. No? No. They can enforce the regulation. They can find. They can. California Highway Patrol is always inspecting trucks. If they find a violation of the federal law, they will fine the truck for that, and they have the authority to do that, and we don't dispute that. I'm out of time, but I would appreciate a couple minutes of rebuttal if I could. Thank you. You know, so what these concession agreements and the policy of the port to eliminate air pollution, if none of that existed, we'd be in the same position today as we are without the state buddying in. Is that what you're telling us? I think what I'm saying, Your Honor, is that there were a lot of purposes, and the ports initially were pretty honest about their purposes. Yeah. They wanted to deal with the environment. Right. They wanted to deal with various labor-related issues. Right. They wanted to deal with having what they said was fewer motor carriers at the ports that had larger businesses that were more financially stable. They had a lot of ideas, but none of those were really safety-related, and this Court properly found the first go-around. Those things are preempted. Those don't fall within the rules. You know, you're not answering my question. Okay, I'm sorry. Yeah. Could you repeat it? No, no, you should remember it. Sorry. You know, I'm just asking you this. You know, if the port had not come up with these programs, and all basically, I suppose, to clean up the environment, are you telling us that we'd be in the same state of amelioration today as we are had the port not gotten on this subject? The answer is no, with a caveat, and the caveat is right now the California Air Resources Board has its own cleanup program, and within five years the California Air Quality Board requirements for truck retirement are the same this coming year as it is at the ports. So the ports simply were like a year ahead of the California Air Resources Board. But if neither the board, I'll answer your question this way, if neither the board or the ports had jumped into this to do something about cleaning up the air, are you asking me whether the trucking industry would voluntarily, on its own initiative, each and every carrier clean up the air itself? The answer is no, but again, that's not part of this lawsuit. We recognize the ability of the Air Resources Board and of the ports to take measures, environmental measures. We're not challenging those. We're complying with them under the tariff requirements. It's the fact is they don't need... How long have the tariff requirements been there? It's been there since they adopted the clean truck program. And when was that? Two years ago, 2008, 2007. So I thought you told us earlier that the progress that's been made has been made under these tariffs that were adopted. It has been. Two years ago. Now you're telling me that none of this would have really happened because the truckers wouldn't have bothered to try to improve the condition of the air quality, the environment. Maybe I misinterpreted your question, but I thought you said without these programs being in place, would the air quality have improved? And my answer was probably not. But the fact is they are in place. The truckers are complying with them. And as I've said, because they're in place, because we're complying with them, they're not being challenged. They are three years ahead of schedule in cleaning up the air. If you're asking me throughout the United States, are truckers going to own up and sell their trucks to be good as citizens, some would, some wouldn't. But certainly the regulation of the clean truck program has accomplished that. We haven't challenged the clean truck program. We've said since the outset of this litigation that we're in favor of the clean truck program. We're in favor of cleaning up the air. All right. Thank you, Your Honor. Good for you. Good afternoon, Your Honor. Everything's working out fine. What are you complaining about? And that is exactly what we're here for. We are here to support what the district court did. The district court, in a 26-page opinion, went through, conscientiously followed what this court told it to do. It determined that nine provisions preliminarily should be deleted, eight should be preserved. All of those eight provisions, Your Honor, relate to safety. Well, I'll accept that. Well, even the placard, Your Honor. Well. Because let me just tell you what the. . . Go ahead. When a judge makes a statement, don't interrupt him. I apologize. I mean. . . The reason I'm saying is. . . You're breathing fresh air here. You know, as a fresh court, if the district court makes a mistake, we don't generally retry the case. You know, the district court made a mistake, but go ahead and say what you want about it. No, no, no. This was a case in which the district court agreed with us. They said that the placard was safety-related. And we pointed out there's an additional reason why the placard doesn't cover it, because this only applies to placards which are on the outside, which relate to descriptions of what's on the truck. All this placard says is if this truck is unsafe, here's the phone number to report it at. It's just plainly obvious that that's a safety measure. And the only thing we said is you only have to keep that placard on while you're on the port. But let me go to the bigger point. Well, all right. Let me ask one other question, and then you can do whatever you want. You want a cold glass of water? Give him a cold glass. No, no, I'm fine. No, no, you need it. You really need it. You know, the port of Long Beach settled. What's the chances of this case of our not having to write anything on this case? Well, obviously there's always a chance. But the port of Long Beach signed a settlement which includes almost all the same provisions. No, I don't want to know about that. No, no, no, I understand. I'm not concerned whether it's good, bad, or indifferent. I don't even want to know about it. I just want to know is are there chances, 50-50, chances to be settled? We have mediation this afternoon, Your Honor, as required by the district court. You've told me enough. Okay. But let me deal with the three points because I think I can convince, Your Honors, that what the district court was within its discretion was not clearly erroneous. Let me remind you what the statute says, Your Honor. The statute says … Is it clearly erroneous or abuse of discretion? Well, the factual findings are clearly erroneous, and there are a lot of factual findings, none of which we believe have been shown to be clearly erroneous. It's abuse of discretion. But the decision whether or not to grant the injunction is an abuse of discretion. Yeah. What do you cite for that authority? For the abuse of discretion? Yeah. I don't know what the abuse of discretion case is in the Ninth Circuit. Yeah. Well, you should know it. I confess that you caught me short on that. Yeah. Well, it's Los Angeles Coliseum versus … That is correct. … National Football League. That is the main … And I was the district judge who was reversed on that case. You ought to know these things, you know. If I can just make the three points … It's the only case I remember. As Your Honor pointed out, there is a deregulatory approach that the federal government has adopted. However, Congress created an exception. And let me read the words of the exception because that's what we're dealing with here. Just read it. Nothing. It says, nothing in the FRA, quote, quote, shall not restrict the safety regulatory authority of a state with respect to motor vehicles. And we contend that all eight of the requirements that the district court adopted relate to the safety regulatory authority of the municipality with respect to motor vehicles. Supreme Court says the municipality is the same as a state in ours, garage. So the only question is not whether this is safety related, but the contention by Mr. Diggs that these are duplicative. The answer to that is that duplicative regulations, where the state adopts similar substantive requirement to the federal government, occurs all the time. And the reason they do that is because they provide additional enforcement. Here, our enforcement technique is the concession agreement. It provides for direct privity between the port and the driver and the trucking company. And it is that privity which makes these safety regulations that much more effective. There is evidence in the record. There is uncontradicted evidence in the record from Deputy Director Holmes that the privity created by the concession agreement makes our safety regulations more effective. That seems to me to meet the requirements of ours, garage. It meets the requirement of Your Honor's decision in Tillerson versus Gregoire, which is was this reasonably calculated? Was this reasonably anticipated to improve the safety at the port? So the only other question, Your Honor, is was this, in fact, safety? And let me just ask a simple question which relates to exactly what I believe one of the judges asked before. If a truck comes onto the port that has a bomb on it, is it fair to say that people located near that truck or in that port are unsafe by reason of that bomb? The fact of the matter is we, the City of Los Angeles, Mayor Villaraigosa, officials at the port, have the ultimate responsibility to make sure that this port doesn't blow up, that unsafe conditions don't occur at the port. What remains from this injunction, what the district court permitted to remain in effect, all relate to that central mission, which is to produce a port in which people who ship, people who are passengers, and there are lots of them on the port, cargo owners will not suffer injury by reason of a truck coming onto the port or a driver coming onto the port that will endanger cargo or people. And that is the whole purpose, Your Honor, of the concession agreement. Well, you're saying that the city's regulatory scheme or program or efforts are more efficacious than those provided by the federal government. Well, the federal government really doesn't deal with the land side. The federal government really deals with the seaside, the ships and what comes into the port. Really, it is true the federal government has a role, but ATA is just simply wrong when they say that the federal government has occupied the whole landscape when it comes to the land side security of a port. We have the primary responsibility for ensuring that people who come in from the land side perimeter are safe. Yes, we have to file security reports with the federal government, but I will tell you that if something happens at that port, yes, they will look to the federal government, but they also look to the city, to the mayor, to the director of the port, and ask, why did you allow this truck to get onto this property? It is a joint responsibility to ensure the security of the port of Los Angeles. It is a responsibility of the city of Los Angeles. It also is a federal government, but it is nowhere near, and there is no statute that they've cited. There is no provision of law, no precedent, which says that only the federal government should be involved in this. Quite to the contrary, even by their own brief, until 2003 and 2006, this whole area was exclusively our domain. More recently, after 9-11, the federal government has gotten involved in it, but it is a joint responsibility between us and the federal government, and we are taking it seriously. I say it is, I know, but, you know, the problem is, regulation of motor vehicles is the problem of truckers is the problem of the federal government, and not the state of California. Except within the exception. Highway patrol and arrest people will violate the law. But, Your Honor, that is not the limitation of it. The exception says the safety regulatory authority of a state, and the whole issue of is the California Highway Patrol exclusive? The state of California, when this case was previously in front of this court, the Attorney General filed a brief in which he said that our exercise of this safety authority was within the state's safety authority. Yes, the CHP deals with the highways, but this is not on the highways. This is on our property. There is a brief, and we're happy to provide you with another copy of the brief which was filed the previous time, but the Attorney General clearly and definitively said this was within our substantive authority to exercise. The Attorney General of the United States? No, no, the Attorney General of California. Oh, California, okay. Now, the Attorney General Brown and his representatives filed that brief. The issue you talked about, yes, CHP has its role, but the Attorney General said we clearly were exercising the safety authority of the state when we were CHP? I'm sorry? California Highway Patrol. I got you. I'm sorry. All right. So the final question really before the panel is, was this really a bona fide action for security purposes? We'd agree, Your Honor, this program has saved more lives because of the Clean Air Act aspects. I mean, none of this would have happened if we had not adopted the CTP, and we did have one of our motives was clean air, and that has been achieved despite the litigation. But we had a second and as important motive, which was safety and security. And with respect to those aspects, that these provisions, the ones which were not enjoined by the district court, relate to the safety and security. And, Your Honor, quite frankly, our view is that the district court did a conscientious and zealous job. What do you say to the argument that, yes, some of these things are safety, but it's duplicative and therefore it really doesn't, it's not safety related because duplicative. What do you say to that argument? The word duplicative really refers to the substantive requirements. It's not duplicative in terms of its enforcement mechanism because we have far more superior ways of enforcing these safety requirements. The CHP limited resources. The federal government, there may be a federal requirement, safety requirement, but there are no federal inspectors standing there at the gate ensuring that these trucks meet the requirements on our property. It's our police. It's our officials. It's our tenants who actually enforce it. Yes, you're duplicating the rights, but, in fact, you have an enforcement mechanism that's far more effective than it would be without what you're saying. It's more effective because you've got bodies on the ground checking on things. And we have the direct relationship with the trucking company because of the concession arrangement. We have privity with the trucking company. And I know there was mentioned earlier about the employee mandate. Obviously, that's not in front of your court. But the reason we did that. What did you say or mention about what? The requirement that the trucking companies use employees in performing their work. That was enjoined by the district court. But that was adopted for a safety reason because of our view that employees, as opposed to independent contractors, would be more likely to zealously guard the safety of the trucks than would an independent contractor. Wait. I was told, we were told, that when they're talking about independent contractors, they're talking about people that own the trucks. Are you saying that's incorrect? No, no. They do own the trucks. But what we're saying is what our original program required was that the trucks be operated and owned by the trucking company as an additional safeguard for the safety. My only point of briefing. Is that an example if a person owns a truck and that person is also the driver? You don't have any. We have no control over them. We have no control. What do you mean, don't have control? Well, we have no control over that in the same sense that we have control over our own truck. I mean, I'm talking about a licensed motor carrier. And a licensed motor carrier which owns the truck and who has an employee operating the truck has a more direct privity in terms of operating. I don't understand that. I mean, if somebody owns a truck and they're driving the truck that they own and they've got their own one man, one trucking company, what's the problem with that? There are too many of them. You can't oversee them. You can't line them up. Well, the original concern was that the licensed motor carrier with whom we had the relationship couldn't oversee the trucks as well as would be the case if that licensed motor carrier had employees and trucks owned by the licensed motor carrier operating. It's a matter of supervision and control. And that's eliminating the trucker who wants to improve his lot in this world by buying his truck and taking good care of it and comply with all the rules. You're just saying then there may be too many of them so we can't control them. Is that what you're saying? Well, I may have digressed off to an issue that's not really before your honors. Well, I'd like to know what's going on in this world. I don't like to make decisions with blinders on. No, I understand. The port, after looking at the way the operations were taking place, determined that enforcement of the safety and security program would be more effective by developing a direct privity between ourselves and the licensed motor carriers and asking that those licensed motor carriers establish a direct employer-employee relationship with the actual drivers because in the absence of an employer-employee relationship, they lack sufficient control over the safety operations that they would have with an employee. And indeed, your honor, Why is that? How many people are there like this that own their own truck and drive it? Thousands of them. Thousands of them? Yes. And how many other trucks are there that go through there? There are in the thousands, if not the tens of thousands. There are a certain number which are You can't get those. So you want to put thousands of people out of business? Is that what you want to do? Well, they won't be out of business. They will be moved into moving for the licensed motor carriers. But even they would be able to themselves become licensed motor carriers. Do you want to force them to join these big companies? No. Actually, they could themselves become a concessionaire, a licensed motor carrier. But let me move back to the point I was trying to make outside of this, which is that in our view, what remains before this court is a program that is safety-related. The eight provisions that remain are safety-related. They fall within the exemption created by Congress, which preserves state safety authority. And each of these requirements are more adequately, far more adequately, addressed by the port through its concession agreement. I might add that there is actually uncontradicted evidence in the record about the efficaciousness of the concession agreement. It isn't as if ATA introduced evidence saying our program didn't work and didn't add anything. The only evidence in the record is evidence from our own personnel who supervise the program, who testify as to the effectiveness of this program and how it has worked in fact. Well, what's wrong with the Long Beach program? What is it? Why don't you just adopt that program? I'm not asking you for any secrets because this is all public information anyway, right? We had a secret agreement. Are you referring to the program prior to the settlement, the program? I'm referring to the settlement. Well, the settlement does away with the concession arrangement. It keeps some of the substantive requirements, but it is, in our view, clearly What do you mean it does away with it? Well, it is clearly not as effective. In our view, the city's view, it's not as effective. It will not be as enforceable as our program is. You're talking about the independent people. No, no, no, this has nothing to do with it. You know, you use all these words. You're sleeping with this case, and you use words, and I get an idea, I think, of what you're telling me. I suppose I'm wrong, but so explain that to me. Again, there are differences between what they've agreed to in their settlement and our program. There are not as many requirements. But more importantly, our view is that Well, that doesn't tell me anything, does it? Our view is that the For example. What's the most important for example? I will confess, Your Honor, I have not gone through and done a comparison between the two programs. Okay, so you don't know. I'm not prepared to tell you what are the differences at this point. Okay, well then just tell me that, that's all. But I do know that the program has a registration program, which we do view as being less effective than the concession arrangement. Why can't, say, the city of L.A. get together with the trucking association and get together with the highway patrol? In other words, bring all the entities together and work out a program where they all participate and it's an efficient program that not only ensures effective operation of the port, but also takes care of safety and security issues. I mean, if you're going to have a problem at the port, then they're all going to start pointing fingers at one another. And then the New York Times is going to say, ask, Well, why didn't these people get together and work out a common plan? Because the trucking association and the trucking trade association has a litigation position, which is very absolutist in terms of contending that the port really has no control over it, over who can come onto our property. And as a result, essentially, whenever we have argued that we need the control in order to ensure the security, we've run into a blank wall. Well, everybody can work together in one unit. I mean, I think it's stupid. I'll take that back to my client, Your Honor. But I think for present purposes, the issue is, should the current existing preliminary injunction, which has obviously invalidated certain provisions, should be upheld. We've got a way to get this thing set up so that the public is protected and the port is protected and everyone's little turfs feel somewhat secure. All right. Thank you, Your Honor. You're welcome. So you guys are the bad guys, huh? It appears so, according to Mr. Rosenthal. Your Honor, the last statement Mr. Rosenthal made is so outrageous, I just have to respond in that we are absolutists that won't acknowledge that they have any ability to control who comes onto our property. You sound a little bit like it. You know, when you first got up here, it's like, you know, what are these guys? You sound like you're the federal government, you know. We're the feds. Now, get out of my way. So, counsel, I've got a question for you when Judge Bakerson's done. I'm done. I'm over it. So here's my question. If a lot of the gripe of the ATA is that the port's regulations are duplicative, that is that they require the same thing as some federal regulation, how do you answer their argument that they be duplicative in substance, but they give them another handle for concurrent enforcement that they think is more effective? So what's the answer? Why can't a local government share in the process to protect local people? They can, Your Honor, and the idea that they need a concession plan to be able to do that is a complete scam. That is simply not true. They have the current ability right now to enforce all of those safety provisions, any applicable security provisions, and all environmental provisions. This is all an excuse to allow them to use a concession agreement. We're not talking about the Clean Trucks Program. We're talking about a concession agreement that gives them the control over who is able to compete at the ports, who is able to be allowed in interstate commerce at the ports, and that's what they want to control. It was clear to this Court in the first round that they were adopting this position not for safety purposes, not for environmental purposes, but to reshape the trucking industry into their own image. They have their own views, their own goals, their own political agenda to reshape the trucking industry. They talk about the ability of direct privity. I don't know what that means, direct privity. They already have the ability to enforce all these obligations. When they say direct privity, what they want is what the Court called the unique enforcement mechanism. They want to be able to say, for whatever reason, we don't like you, motor carrier. We don't think you're going to be a stable motor carrier. We don't think you may be safety, so you don't get to come to the ports. That's the end of it. Well, there's more to that than that. That's exactly their position, Your Honor. Well, from what I read, that's not quite as gross as you would put it. It is, Your Honor, because, again, they say we're absolutists. We just made a deal with the Port of Long Beach, and if you look at that registration agreement, we acknowledge that they have the right to control who comes onto their port. We will enter all our trucks in the Drage Truck Registry. All our drivers will have TWIX. That will all be entered. They can reject any truck that comes up to the gate. They can reject any driver that comes to the gate. Once you're on the port property under the agreement, they can do spot inspections, vehicle inspections. They can do maintenance inspections. They can do emissions inspections. They have complete control. The only thing they don't control is to be able to say, Mr. Motor Carrier, we don't want you on our port because we want fewer motor carriers. And to be honest with you, Your Honor, the reason they want fewer motor carriers and they want employees is they want the Teamsters to be able to organize them. And that's the elephant in the room that no one talks about, and that's the basis of why they're pushing this concession point. Well, that's certainly one on me. I mean, that's that curve that they're throwing in the World Series that I don't recognize in this case. And if that is the situation, then it ought to be in the case and not to come up with a curve at us and say, boy, the Teamsters got these guys. Your Honor, we're doing our best to develop that evidence. Unfortunately, we're going to. And, you know, that's not a proper argument. Well, I agree, Your Honor. It's clearly in the press as to what the motivation is. It doesn't take a lot to put the dots together as to why they want employees rather than independent contractors. They're out of it already. They're not. That's already out of it. Everybody's been arguing this employee business, and that's not even in the case anymore. I agree, Your Honor. And my point is that all of these safety rationales have been after-the-fact post-hoc rationalizations to try to resurrect the – because that's all they have left is the concession program. They don't need the concession program. The concession program is simply an excuse to try to wield this control over the motor carriers and who preserves the port. Well, there's a conspiracy here with the Teamsters. Is that what you're saying? I don't know that it's a conspiracy. It's certainly – the Teamsters support this effort. Almost anything can be a conspiracy these days. The Teamsters certainly are involved with this. We know that. How are they involved? The Teamsters have supported this program. The Teamsters have shown up at our meetings supporting this program. The Teamsters are one of the main proponents of the concession agreements and the clean truck program. Your Honor, I agree that, by and large, that – I think it is relevant what the port's motivation is. The port's motivation here, in my view, is not safety because, as I've said, and I'm not exaggerating, they have the ability right now to do everything they want to do in terms of safety. They don't need a concession agreement to do it. The fact that Long Beach has now accepted the registration agreement, I think, shows that in spades. Let me just say something to you. We're in a preliminary injunction stage. The only thing we want to concern ourselves with is whether there are safety considerations. Now, this case is going to go to a final decision. Everything that you say can be proved and put up to the courts. But, you know, the injunction can be very broad and very specific and can take into account everything that you're concerned about. It's not at this point, though. And if I were the district judge, you know, hearing the case in the final terms, everything you say may have some relevance. But you can't put it on us now. The only thing I want to decide here is whether or not there's enough to support the district court that there's safety concerns in these preliminary injunctions. If not, out. If yes, at least in for the time being without it being anything final. So we've got a limited position here. You're right, Your Honor. If the bottom line was, I would suggest if the bottom line is that even though those things are duplicative and not aimed at any particular problem and they could otherwise enforce, sure, let them put them in a concession agreement. But don't give them the enforcement ability to say if you violate this, we are going to rescind your concession. Well, I think that's a castle argument. And I think that's something that we can't decide. But that's certainly a matter that will be up in the final decision. I think that's the way I look at it. Well, I think the castle argument is before this court. Let me just tell you something. You see, he's a little older than I am, but not by much. I'm catching up with him. But, you know, I've been on the bench since 65, probably before you were born. And I have overseen, I oversaw the construction of the I-105 freeway. And if you think that was easy, it wasn't. And I oversaw the reconstruction of the Hyperion sewage plant, which is awarded the distinction of being among the top ten public works projects of the 20th century. And in each of those cases, you had people, lawyers, that had the vigor that you folks are displaying here, pulling and tugging and your own interest to protect, vituperation that passed back and forth. And everyone had ulterior motives. You know, I contended with Jerry Brown, who's my dear, don't quote me on this, friend. I like him. I like his father and wonderful people. But he was anti-freeway. You know that? He didn't want any freeways. And here I was on the last leg of General Eisenhower's interstate highway program. So I had to work with that. And I managed. And the big job, and you're going to, somewhere along the line, you're all going to have to get together. The big job was getting people who had the common stakes and in some instances common interests and goals to start to work together and get along and work these matters out. That's the big problem. And I started the freeway case in 72, and I'm still with it. And the other one took from 76 to the last day of 98. And the big problem in all these matters is getting people to work together. And you're going to just have to face it that this is the way this thing is going to work out. Otherwise, the fight's going to go on. And I had part of this Alameda corridor trained over a thousand people in one of our programs to work on that. And things can move here. There's a lot of talent in Los Angeles. So you better get together and see if you can't find common ground. We agree, Your Honor, and that's why we approached Long Beach and settled the case. If you had a group here with the trucking industry, you're not going to hit me with your cane, are you? No, I'm getting ready to hit myself. That's what you have to do. And then Judge Snyder or a special master will probably preside over this for a number of years to come. You're going to be together, you know. It's a marriage. And now one of the things that I found that was very successful for me when I brought these people together in the freeway case, and we had all kinds of different interests involved, and there were lots of fights. I brought them in a room, and I gave them as a gift Dale Carnegie's book on how to win friends and influence people, and we held seminars on that. And that kind of changed things. So it's not going to do any good to be insulting one another. It gets too personal, and things don't get done. So there's a bookstore down here. You can go buy a copy of it. If I could say, I enjoyed that book years ago, and I also enjoyed being an advocate at the bar, and I appreciate the very highly skilled advocacy of both the Trucking Association's council and the city's council. I realize they haven't been able to reach agreement yet, but their spirited advocacy is something that this country's had since de Tocqueville wrote his memoirs. So I think it'll work out. Either they'll reach agreement or the court will decide, but they're excellent lawyers on both sides. Well, that's fine, and that's all good, but the goal here ought to be to work out. You see, this is not the kind of lawsuit where one wins and the other loses, and you go your separate ways, because you're not going to go your separate way. You're bound to each other, right? Whether you like it or not. This is a very important issue for the country. For the country. And it's just not like, yeah, you win, you lose, see you later. This is going to go on for years, and it's important. And if there's a problem that happens over there, they're going to blame the inability of you people with the governmental indices to fail to get together and work this thing out and coordinate it. So that's what you, you know, litigation is fine, but alternate dispute resolution is better. And I don't want to volunteer to take over this case. Yeah, I've been thinking about it. We understand, Your Honor. As I said, we're amenable to settlement. We're amenable to settlement, and we are looking at going forward with a mediation session this afternoon. So I very much appreciate all the time the court has allowed. Where are you going to be? In downtown Los Angeles somewhere at a mediator's office. Is that a court mediator? Yes. All right. Well, we have a very good mediation service, and I wish you all the best. And it's been an enjoyable session, and you're good lawyers. But, you know, the idea here is not to be good gladiators but to get something done. Thank you, Your Honor. And go in peace and brotherhood and sisterhood. And, my God, it's a quarter after 1. And I will see you around. Thank you very much, Your Honor. Bye-bye. Thank you. Court will recess until 930 tomorrow morning. All rise for 10 minutes until 930 tomorrow morning. I'll leave it here. Okay. Yeah. Let's go up here.  All right.
judges: Bright, Pregerson, Gould